# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JESUS ORNELAS,               )
                                      )
                **Plaintiff,**      )
                                        )
**v.**                                      )
                                      )    **Case No. 11-2261-JAR-KMH**
**C.R. LOVEWELL,**        )
                                      )
               **Defendant.**    )
_____ )

## MEMORANDUM AND ORDER

Plaintiff Jesus Ornelas brings this action pursuant to 42 U.S.C. § 1983, alleging that

Defendant, Trooper C.R. Lovewell, violated his Fourth Amendment right against unreasonable

seizure by employing excessive force during an arrest for driving under the influence.[1]  This case

is before the Court upon Defendant's Motion for Summary Judgment (Doc. 43) and Motion to

Exclude Expert Testimony (Doc. 45).  As explained in detail below, the Court grants in part and

denies in part Defendant's *Daubert* motion and further finds that, because Plaintiff cannot prove

that Defendant violated a clearly established constitutional right, the motion for summary

judgment must be sustained.

I.      **Facts**

The following facts are either uncontroverted or stated in the light most favorable to the

nonmoving party.

Jesus Ornelas was stopped by Defendant Trooper C.R. Lovewell in Johnson County,

---

[1]Plaintiff expressly abandoned his claim of excessive force under the due process clauses of the Fifth and Fourteenth Amendments, as asserted in Count II, and stands on his Fourth Amendment excessive force claim.  Doc. 59 at 33, n.9.

Kansas during the late evening of April 28, 2010. Trooper Lovewell administered field sobriety tests and a preliminary breath test to Ornelas, then placed Ornelas under arrest for driving under the influence ("DUI"). Using Ornelas's cell phone, Trooper Lovewell contacted Ornelas's family to arrange for them to retrieve his vehicle in lieu of having the vehicle towed. Trooper Lovewell placed handcuffs on Ornelas, behind his back, and placed him and seat-belted him into the front passenger seat of the patrol car. Ornelas's wife and daughter, Lourdes and Veronica Ornelas, respectively, arrived. Veronica got out of the vehicle and spoke with Trooper Lovewell, underneath the street light and street sign at the corner, some distance in front of the patrol car.

While Trooper Lovewell was speaking with Veronica, Ornelas managed to honk the patrol car horn twice. Ornelas testified that his throat was very dry and he was "suffocating," and he honked the horn, although his hands were still cuffed behind his back. Trooper Lovewell said to Vernonica, "He's going to piss me off here in a second," and walked toward the passenger side of the patrol car, outside the view of the video camera. As Trooper Lovewell approached the patrol car, Ornelas said, "Puto hombre. Chinga su madre, puto."[2] Ornelas testified that he was saying "bad words" because he "felt shame that [Trooper Lovewell] was talking to my daughter and that they saw me in this state, and the suffocation that I was feeling." Ornelas stated that he felt shame because he was being seen drunk.

Trooper Lovewell opened the car door and Ornelas said, "I don't wanna see my family

<hr />

[2]Although Trooper Lovewell testified that he understood what Ornelas was saying, neither party translates this phrase. The Court notes that "puto" loosely translates from Spanish to a derogatory term for a male prostitute or homosexual, and "chinga su madre," translates to "go fuck your mother."
 http://dictionary.reverso.net/spanish-english

over here.  What you want to go . . . ."  Lovewell asked, "What?" and Ornelas repeated, "I don't

wanna see my family . . ."  Lovewell replied, "I don't care," and Ornelas repeated back, "I don't

care?"  Ornelas testified that Trooper Lovewell was "really upset" with him as he approached the

car, and Veronica began walking towards the patrol car because it was clear that her father was

agitated and she wanted to calm him down.

After this verbal exchange, Trooper Lovewell attempted to close the door of the patrol

car.[3]  Ornelas testified that he put his foot down towards the concrete and then the Trooper

"slammed the door and it caught my leg."  Trooper Lovewell was unable to close the door

because Ornelas's right foot and/or leg was in the way.  Ornelas used his left foot/leg to push

against the door and Trooper Lovewell then opened the door and kicked Ornelas just below the

right knee.  After the kick to his right leg, Ornelas turned back into the car and Trooper Lovewell

shut the door.  Ornelas was then taken to the jail in Gardner, Kansas.

The stop was recorded on a video camera inside Trooper Lovewell's patrol car, which

was activated before Ornelas came to a stop.  The in-car video recorded and continued to record

until Ornelas was removed from the Johnson County Jail by ambulance.  In addition to the video,

the recording captured audio on two different stereo channels, with one channel recording from

the in-car microphone and the other channel recording from a wireless microphone affixed to, or

worn by, Trooper Lovewell.

From the time Trooper Lovewell said "I don't care," until the time the car door actually

shut, just over ten seconds expired.  When Ornelas repeated back "I don't care," his voice

---

[3]Trooper Lovewell testified that Ornelas kicked the door from Lovewell's hand, nearly striking Lovewell
before he tried to shut the door.  Ornelas denies kicking the door until after Lovewell attempted to close the door.
As explained in detail, *infra*, for purposes of this motion, the Court assumes Ornelas's version of events true.

inflection went up. Ornelas then said, "Chinga su madre, puto," then began to say, "You know, I

. . ." Trooper Lovewell is heard to say "Get your f—," which is an incomplete word, not a

deleted expletive. There is a non-verbal sound immediately preceding Ornelas's scream, then

Trooper Lovewell is heard to say, "get your foot in the car." The door then slammed shut, and

Trooper Lovewell said, "Don't you shove that door open on me."

Veronica Ornelas testified that her father screamed when Trooper Lovewell tried to close

the car door on his foot/leg, that Lovewell then opened the door and kicked Ornelas, and that her

father screamed before the kick.

Trooper Lovewell testified that he did not realize that Ornelas's foot was in the way until

Lovewell noticed the car door would not shut, staying open about three or four inches. Lovewell

then pulled the door back and saw Ornelas's right foot in the hinge of the door. Trooper

Lovewell testified that he did not know whether Ornelas was pushing the door, but his foot was

up against the door holding it open. Ornelas admits that he was pushing against the door with

his left leg when Trooper Lovewell slammed the door on his right foot/leg.


Prior to honking the patrol car horn, Trooper Lovewell had observed Ornelas and his

demeanor for nearly thirty minutes. Ornelas was extremely intoxicated. Trooper Lovewell

testified that when Ornelas honked the horn, he was concerned that Ornelas might have escaped

his handcuffs. Lovewell testified that when he went to check on what was going on in the patrol

car, he observed Ornelas's demeanor as "enraged." Lovewell did not know whether Ornelas was

preventing him from shutting the door so he could get out of the car. Lovewell further testified

that he did not know whether Ornelas had the seat belt on or what the status of the handcuffs

was.  On previous occasions, Lovewell had persons move handcuffs to their front.  He had "no

idea" how Ornelas was able to honk the horn in the center of the steering wheel.  Lovewell

testified that at the time the horn was honked, he did not know what Ornelas was doing, whether

he had climbed over into the driver's seat, whether he was still belted into the seat,  how he was

honking the horn, or what was going on inside the patrol car.  Trooper Lovewell testified that he

was concerned that Ornelas was attempting to exit the vehicle, and specifically concerned, "to

get the door shut, keep him in the car and deal with whether or not the seat belt was on, where

the handcuffs were or anything like that after I was able to keep him in the car."  Lovewell

testified that as he kicked Ornelas, he perceived a threat to loss of control of Ornelas in "the

aggression that exploded there in a short time frame.  I was just trying to get him under control

and keep him in control and keep him in the car."  He testified that when he tried to shut the

door, he did not know "what the deal [was], but when I couldn't get the door shut, [I] pulled the

door back open and that's when I saw his foot."  Lovewell was trying to kick Ornelas in his calf

area, at the calf muscle, and as low as possible.  His kick to Ornelas's leg was to both maintain

and regain control of Ornelas, and his "concern was to prevent [Ornelas] from getting out of that

car and to keep him in that car so that nothing else could happen and once I was able to shut that

door, it was done."  Trooper Lovewell missed the calf muscle, however, and made contact with

Ornelas's right leg just below the knee.

        After taking Ornelas to the Johnson County Jail, Trooper Lovewell administered an

alcohol breath test, which indicated a breath alcohol content of .229 grams of alcohol per 210

liters of breath.  After Ornelas complained of pain at the jail, Trooper Lovewell photographed

Ornelas's knees and noted that the right one had begun to swell.  Ornelas sustained a tibial

fracture, which is a break in the upper part of the tibia bone of his right leg that involved the joint part of his knee.

These are the basic facts under which the Court must analyze both Defendant's *Daubert* motion to exclude Plaintiff's expert testimony as unreliable, as well as Defendant's motion for summary judgment.

## II.     *Daubert Motion*

Because Plaintiff incorporates his experts' opinions into his statement of uncontroverted facts, the Court will address Defendant's motion to exclude their testimony.

The Court has broad discretion in deciding whether to admit expert testimony.[4]  Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[5]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[6]  In order to determine whether an expert opinion is admissible, the

---

[4]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[5]Fed. R. Evid. 702.

[6]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[7] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[8] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[9] And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[10]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[11] But "the gatekeeping inquiry must be tied to the facts of a particular case."[12]

It is within the discretion of the trial court to determine how to perform its gatekeeping

---

[7]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[8]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[9]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[10]*Id.*

[11]*Daubert*, 509 U.S. at 593–94.

[12]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

function under *Daubert*.[13]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[14]  In this case, the parties have not requested an evidentiary hearing on Defendant's motion, as there has been no challenge to the witnesses' qualifications.[15]  The Court has carefully reviewed the exhibits filed with the motion and believes this review is sufficient to render a decision upon the objections without conducting an oral hearing.

### A.     Tom Owen

Tom Owen is a forensic analyst offered as Ornelas's audio expert.  Owen received a copy of the video of the stop from the camera mounted in the car and the audio from Trooper Lovewell and from the inside of the car.  Owen took the video and split out the audio and isolated the Channel 1 and the Channel 2 audio from the recording.  He converted the compressed DVD file to an uncompressed audio video interweave ("AVI"), which is a higher quality file in which every discernable piece of information is available with audio and video.

Owen enhanced the audio on the channel for the in-car microphone by increasing the amplitude, *i.e.*, turning up the volume on the recording, for the inside microphone by five or six decibels.  Owen did not increase the amplitude of Trooper Lovewell's audio track; it was loud and in some cases, distorted.  Owen created his enhancements and excerpts using commercially available software.  Specifically, he created visual depictions of segments of audio using Sound

---

[13]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[14]*Id.*

[15]The parties offered to make themselves available for oral argument, should the Court have questions on the motion.

Forge, manufactured by Sony; he used Isotope to eliminate intermodulation distortion; and he used Prism to convert the DVD to AVI. Other than increasing the amplitude, Owen did not make any changes as to what can be seen on the video or what can be heard on the audio. With respect to the audio wave forms and audio excerpts created by Owen from the original DVD video, nothing changed, so that one hears whatever sound was recorded.

Owen created a "Cue List"[16] that sets forth the timing and characterization of certain sounds on the three audio excerpts he created:

| Owen Cue List Time Marker | Statement/Sound |
|---|---|
| 09:787 | Horn honks |
| 12:956 | in Spanish: Chinga su madre punto madre |
| 17:972 | Ornelas repeats |
| 24.822 | Hey |
| 25.356 | Non verbal click |
| 25.727 | Ornelas: I don't want to see my family, etc. |
| 30.351 | Officer: "What" |
| 31.024 | Ornelas: "I don't want to" |
| 32.674 | Officer: "I don't care" |
| 33.676 | Ornelas: "I don't care" sounds like the door is already open |
| 35.317 | Ornelas: "Chinga su madre punto" |
| 38.833 | Ornelas: "You know |
| 39.784 | Door slam Loud non verbal |
| 39.808 | Striking Ornelas (No audible evidence of defendant kicking door open) |

---

[16]Doc. 48, Ex. I.

| 39.838 or 39:868 | Officer: Get your f . . .as a whack is heard |
|---|---|
| 40.206 | Ornelas screams |
| 41.029 | wack non verbal |
| 41.491 | wack non verbal |
| 41.612 | Officer tells Ornelas to "Get your foot in the car" |
| 42.870 | Door slams shut |
| 43.280 | Officer shouts "Don't you shove that door open on me" |
| 47.459 | Ornelas groaning in pain |
| 49.270 | Officer says "He about cracked me upside the head with my door" |

Owen testified at his deposition that if allowed, he intends to provide an opinion that "we can verify the account of Ornelas because his microphone recorded what he did or what he said he did inside the car," whereas "conversely, the officer's audio from his microphone does not agree with what he said happened." At his deposition, however, Owen could not identify how the audio does not agree with Trooper Lovewell's testimony, other than, "It had to do with the sequence of the injury to Mr. Ornelas." Owen declined the opportunity to go off the record during his deposition to review Trooper Lovewell's deposition to specify how he believed the Trooper's testimony was different from what was contained on the audio.

Defendant does not object to Owen testifying as to what he did to derive the excerpts and split channel recordings, and has identified his own fact witness who did the same thing—create excerpts and increase the amplitude. Defendant does object to the proposed testimony of Owen, which he contends boils down to, "I listened to the audio, I compared that audio against the testimony of the parties, and I will tell you who is being truthful and who is not." Such testimony, Defendant argues, is not helpful to the trier of fact and, indeed, invades

the province of the jury. Moreover, Defendant argues, whether a particular non-verbal sound is a "whack" or a spring in the door hinge is a matter of speculation by Owen and he cannot be permitted to testify as an expert about such speculation. In neither his report nor his deposition did Owen identify the particulars or basis for his conclusion that he can verify Ornelas's version of events.

As discussed in detail below, because this case involves a motion for summary judgment based on qualified immunity, both Defendant and the Court accept Plaintiff's version of the facts, including the sequence of events as set forth in the audio recording. Specifically, Defendant accepts Ornelas's version that he screamed and pushed the door as a result of the door being slammed on his foot, not as a result of Trooper Lovewell's kick. Accordingly, Defendant's objection to Owen's testimony purporting to verify Ornelas's version of events is denied as moot.[17]

### B.    Melvin Tucker

Melvin Tucker is a retired Chief of Police who was retained by Ornelas as an expert on police practices, training, and use of force. Tucker developed a set of facts that he considered disputed, and looked at evidence from both Ornelas' and Lovewell's testimony about what had happened the night Ornelas was arrested, and concluded that regardless of whose version was

---

[17]In the event this case were to proceed to trial, however, Owen's testimony should be limited to the facts of his creation of the recording excerpts. Any characterizations of non-verbal sounds, *i.e.*, clicks, door slams and whacks, as well as Ornelas groaning "in pain," should be excluded, as it is the finder of fact's function to determine which party's version of the sequence of events to believe. *See United States v. Naegele*, 471 F. Supp. 2d 152, 159-60 ( D. D.C. 2007) (finding that the jurors were just as capable of listening to audio records as the expert and needed no assistance in deciding what they heard); *United States v. Mitchell*, 49 F.3d 769, 780 (D. D.C. 1995) (The "district court was well within its discretion in concluding that expert testimony was unnecessary to elucidate tape recorded conversation. Such material . . . is squarely within the traditional province of the jury.").

ultimately credited, the force used was unreasonable, unnecessary, and excessive under the totality of the circumstances.[18] Tucker opines that Ornelas's failure "to put his leg in the car when ordered to do so by Trooper Lovewell was passive resistance only and did not justify Lovewell's use of a kick. . . ." He further opines that "Ornelas was not taking any overt action to harm Lovewell and was only passively resisting (refusing to obey Trooper Lovewell's commands to move his leg into the patrol car) at the time Lovewell kicked him." Tucker's opinions are based upon his interpretation of events from reading the documents and the testimony and watching the video that Ornelas's scream was a result of the door being closed on his leg and not when Trooper Lovewell kicked Ornelas in the leg. Tucker does not know how much time elapsed from the point in time when Trooper Lovewell first shut the door on Ornelas's leg until the kick. Tucker considered "the failure of Ornelas to put his leg in the car when ordered to do so," and "refusing to obey Trooper Lovewell's commands to move his leg into the patrol car," to be "passive resistance."

### Reliability

Defendant argues that Tucker's opinion is "a house of cards based on faulty and fallacious assumptions," specifically, that Ornelas "was sitting and minding his own business doing nothing but ignoring Trooper Lovewell's directive to get his foot in the car." In support of his objection, Defendant cites to *White v. Sedler*, a District of New Mexico case where Tucker was prohibited from testifying because he based his opinion solely on the plaintiff's version of

---

[18]In a preface to the opinion portion of his report, Tucker states, "[a]lthough an opinion expressed by me may state a conclusion, which is also the ultimate issue before the jury, the supporting statements for my opinion, about common practice and understanding in the criminal justice profession, are provided to assist the jury in understanding the evidence and/or in determining a fact at issue in the case under consideration." Doc. 48, Ex. K at 4.

the facts, and made credibility determinations that should be left to the jury.[19]  In that case,

Tucker assumed that the plaintiff was cooperating with the officers and was only "passively

resisting," without taking into account the law enforcement officer's version of events or history

with the plaintiff.[20]  As Plaintiff points out, however, Tucker's opinion in this case is careful to

take into account both party's versions of the sequence of the events.  In any event, Plaintiff

argues, the factual basis of an expert opinion goes to the credibility of testimony, not its

admissibility.

### *Assistance to the Trier of Fact*

Claims alleging excessive force by police officers are analyzed under the Fourth

Amendment "reasonableness" standard.[21]  Whether an officer has used excessive force is judged

by a standard of objective reasonableness, which requires a jury to determine "whether a

reasonable officer in the same circumstances would have concluded that a threat existed

justifying the particular use of force."[22]  The Fourth Amendment "do[es] not require [police] to

use the least intrusive means in the course of a detention, only reasonable ones."[23]  Similarly,

"violations of state law and police procedure generally do not give rise to a [section] 1983 claim"

for excessive force.[24]  Both of these principles avoid a "Monday morning quarterback" approach

---

[19]No. CIV 07 00491 WPJ/DJS, 2009 WL 5124764, at *2 (D. N.M. Apr. 1, 2009).

[20]*Id.*

[21]*Graham v. Connor*, 490 U.S. 386, 395 (1989).

[22]*Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97).

[23]*Marquez v. City of Albuquerque*, 399 F.3d 1108, 1222 (10th Cir. 2010) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)).

[24]*Id.* (quoting *Romero v. Bd. of Cnty. Comm'rs*, 60 F.3d 702, 705 (10th Cir. 1995)).

from which to evaluate the conduct of a police officer, and "requires only that the defendant officers choose a 'reasonable' method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives."[25] These principles also have consequences on the evidence that the trial court may admit.

Defendant does not contest Tucker's qualifications as an expert, but argues that this standard by which his use of force against Ornelas is to be judged is not beyond the scope of the average lay person, and therefore, the reasonableness of his conduct is not the proper subject of expert testimony. Here, Defendant argues, Tucker's proffered testimony provides no specialized knowledge and is premised entirely upon giving his own particular and unsupported interpretation of contested facts. Defendant argues that Tucker's opinion regarding the reasonableness of Trooper Lovewell's use of force will not assist the jury, but rather supplant its independent exercise of common sense when determining the facts.

Ultimately, an expert witness's testimony must assist the jury to be deemed admissible.[26] In doing so, however, an expert witness's testimony may not usurp the jury's fact-finding function.[27] "The line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear; but it is well-settled that "'[a]n opinion is not objectionable just because it embraces an ultimate issue.'"[28] Courts routinely admit expert testimony on police procedures in excessive force cases. As the Tenth Circuit explained, "[c]ourts generally allow

---

[25]*Mata v. City of Farmington*, 798 F.2d 1215, 1226 (D. N.M. 2011).

[26]Fed. R. Evid. 702(a).

[27]*Ortega v. City and Cnty. of Denver*, Nos. 11-cv-2394-WJM-CBS, 11-cv-2395, 11-cv-2396, 11-cv-2397, 2013 WL 438579, at *3 (D. Colo. Feb. 5, 2013) (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988)).

[28]*Id*. (quoting Fed. R. Evid. 704).

experts in this area to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement."[29]  There is distinction, however, between an expert testifying about whether the degree of force used was unreasonable and excessive, and whether the degree of force used was in compliance with well-established police standards.[30]

Accordingly, the Court will admit Tucker's testimony about police standards and procedures, including the training and protocols provided to law enforcement officers on the level of force to use based on the level of resistence encountered, the definitions of active and passive resistence as the terms are understood by law enforcement officers, and how Kansas Highway Patrol ("KHP") Officers are trained with respect to use of force.  Defendant does not contend that Tucker is unqualified as an expert on police procedures, and thus the Court also admits Tucker's opinion on the proper procedures for using force, *i.e.*, opinions relating to general police procedures and standards to which officers adhere and how, in his opinion, they apply to the disputed facts of this case.[31]

The Court excludes, however, Tucker's testimony as to the ultimate issue in this case—whether Trooper Lovewell's use of force was excessive or unreasonable.[32]  Similarly, the

---

[29]*Zuchel v. City and Cnty. of Denver*, 997 F.2d. 730, 742 (10th Cir. 1993) (collecting cases).

[30]*Ortega*, 2013 WL 438579, at *3–4 (citing *Zuchel*, 997 F.3d at 742–43).

[31]*See Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (recognizing "the reasonableness of an officer's action must be assessed in light of the officer's training").

[32]*See Zuchel*, 997 F.2d at 742–43 (allowing testimony where the expert "did not give an opinion on whether [the officer's] conduct was unconstitutional. Rather, he stated his belief that the conduct was inappropriate 'based on [his] understanding of generally accepted police custom and practice in Colorado and throughout the United States"); *Ortega*, 2013 WL 438 579, at *3 (permitting expert to testify about whether the degree of force used was in compliance with established police standards, but not whether it was "reasonable"); *Damiani v. Momme*, No. 11-2534, 2012 WL 1657920, at *2 (E.D. Pa. May 11, 2012) (expert in excessive force case may not "offer his opinion that the officers' conduct was unnecessary, punitive, [or] abusive" because such testimony "answers the very question asked to the jury, and the Court will not permit an expert to invade the province of the jury").  Tucker

Court excludes any testimony that Trooper Lovewell did not follow the KHP or generally accepted policy and training, as well as any testimony that Lovewell could have used a less intrusive alternative to the force he used, as this evidence is irrelevant to whether Ornelas's Fourth Amendment rights were violated, as long as Trooper Lovewell used reasonable force.[33]

## III.  Discussion

### *Standards*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[34]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[35]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[36]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[37]

Defendant contends that he is entitled to qualified immunity on Plaintiff's claim of use of excessive force in violation of the Fourth Amendment as asserted in Count I.  Upon a summary

---

admits as much in a preface to the opinion section of his report, where he explains that "[a]lthough an opinion expressed by me may state a conclusion, which is also the ultimate issue before the jury," the supporting statements are provided to assist the jury.  Doc. 48, Ex. 11 at 4.

[33]*Marquez*, 399 F.3d at 1221–22.

[34]Fed. R. Civ. P. 56(a).

[35]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[36]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[37]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

judgment motion, when a qualified immunity defense has been raised, the plaintiff must demonstrate that 1) the defendant's actions violated a constitutional or statutory right and 2) that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue and under the circumstances in question.[38] The court may decide the appropriate order to consider these issues.[39] If plaintiff makes this showing then the burden shifts back to the defendant to demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.[40] "A qualified immunity defense will not succeed [upon summary judgment] . . . when the facts considered collectively present an incomplete picture of the relevant circumstances."[41]

Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[42] Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[43] "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[44] The question is not whether the right not to suffer excessive force in general is

---

[38]*See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011), *cert. denied*, 133 S. Ct. 211 (2012).

[39]*Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

[40]*Id.*

[41]*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (interior quotation omitted).

[42]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[43]*Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

[44]*Saucier v. Katz*, 533 U.S. 194, 202 (2001).

clearly established, but whether under the facts of the case plaintiff's right not to suffer excessive force was clearly violated.[45]

In determining whether the plaintiff has met his burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party.[46] "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[47] The Court has reviewed the audio and videotape recordings submitted by the parties and finds that neither blatantly contradicts Ornelas's testimony.[48]

## A. Violation of Constitutional Right

Defendant urges that, even viewing all of the evidence in the light most favorable to Ornelas and accepting his sequence of events as true, no constitutional deprivation occurred because he was presented with a drunken detainee who, enraged by the presence of his wife and daughter at the scene, attempted to escape from custody by exiting the patrol car and who initiated the use of force by kicking the patrol car door. Ornelas counters that the record shows that a 235-pound, "pissed off" highway patrol officer kicked a small, 52-year old drunk male who was handcuffed behind his back and seat-belted into a patrol car. The angry kick was so

---

[45]*Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).

[46]*Scott v. Harris*, 550 U.S. 372, 378–80 (2007); *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them").

[47]*Scott*, 550 U.S. at 378, 380. In *Scott*, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of events. *Id.* at 379.

[48]Doc. 48, Exs. L, M.

forceful it broke his leg, and Ornelas argues that Trooper Lovewell attempts to shift blame to the victim.

Excessive force is determined under an "objective reasonableness" standard from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[49] "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[50] "Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."[51] What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time.[52] Moreover, the Fourth Amendment "does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."[53]

The totality of circumstances is examined, including the following factors set out by the Supreme Court in *Graham*: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest

---

[49]*Graham v. Connor*, 490 U.S. 386, 396 (1989); *Cordova v. Aragon*, 596 F.3d 1182, 1188 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1146 (2010).

[50]*Graham*, 490 U.S. at 396.

[51]*Saucier*, 533 U.S. at 205.

[52]*Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (citation omitted).

[53]*Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (citation omitted).

or attempting to evade arrest by flight.'"[54]  The proper inquiry is whether Defendant's use of force was "objectively reasonable in light of the facts and circumstances confronting [him], without regard to underlying intent or motive."[55]  The perspective of a reasonable officer includes an "examination of the information possessed by the [officers]."[56]  Measuring the reasonableness of force is generally a fact issue for the jury.[57]  But, "'the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment—a plaintiff must identify the specific unreasonable conduct that caused his or her injuries.'"[58]

Looking to *Graham's* first consideration, when Trooper Lovewell approached the patrol car, Ornelas had been arrested for lane violation and DUI; as Ornelas points out, he was not arrested for obstruction and assault on a law enforcement officer until after Trooper Lovewell administered the kick to his leg.  While DUI may not be an inherently violent crime, the Tenth Circuit has noted that "[b]ecause individuals who are intoxicated are often unpredictable, [officers are] confronted with an additional layer of uncertainty."[59]  There is no question that Ornelas was quite drunk at the time of the incident, and became very upset when his wife and daughter arrived on the scene.

---

[54]*Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (quoting *Graham*, 490 U.S. at 396).

[55]*Graham*, 490 U.S. at 397.

[56]*Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

[57]*Buck v. City of Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008).

[58]*Giannetti v. City of Stillwater*, 216 F. App'x 756, 766 (10th Cir. 2007) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 770–71 (7th Cir. 2005)).

[59]*Novitsky v. City of Aurora*, 491 F.3d 1244, 1255 (10th Cir. 2007).

On the second factor, the facts show that the situation at the time Trooper Lovewell kicked Ornelas was tense, uncertain, and rapidly evolving, and a reasonable officer in his shoes would have believed that an effort to resist or fight back was in the offing so as to justify the use of force.  Specifically, Ornelas had somehow managed to honk the horn of his patrol car, despite being handcuffed with his hands behind him;  as he approached the car and opened the door, Trooper Lovewell could hear that Ornelas was "agitated or enraged";  when he attempted to shut the passenger door, Trooper Lovewell could not do so, and Ornelas admits he was pushing against the door as Lovewell closed it on his foot; when he again opened the door, Ornelas's right foot was in the hinge preventing the door from closing; and the Trooper faced Ornelas without any backup officers on the scene and Ornelas's daughter following behind as he approached the patrol car.

Ornelas counters that there is sufficient evidence from which a jury could conclude that he was still handcuffed and seat-belted and although he might have tried to stick his right leg out of the car, he clearly was not going to make it out of the car.  All Trooper Lovewell had to do, Ornelas argues, was to slow down long enough to look and see that Ornelas was still cuffed and belted, and just step back.  The Tenth Circuit has held, however, that

> If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed. . . . A reasonable officer need not await the glint of steel before taking self-protective action; by then it is often too late to take safety precautions.[60]

While this case does not involve a potential weapon, the Court finds that Trooper Lovewell was

---

[60]*Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (alterations omitted) (internal quotations omitted).

not required to wait for the situation to play out further until Ornelas was out of the vehicle before taking self-protective action to regain and maintain control of the situation. Moreover, it is well settled in the Tenth Circuit that the Fourth Amendment does not require an officer to use the least or a less forceful alternative.[61]

Finally, on the third *Graham* factor, Ornelas argues that there is no serious dispute that he was trying to evade arrest by flight, as he was already under arrest, and that pushing against the car door that was being shut on his leg while his hands were cuffed behind his back is not actively resisting arrest. Ornelas contends that Lovewell did not instruct him to get his foot in the car or give him time to move his leg before he kicked it with enough force to break his tibea. It is undisputed, however, that Ornelas's right foot prevented the door from closing and that Ornelas pushed against the door with his left leg. It is also undisputed that Trooper Lovewell did not know Ornelas's foot or leg was in the way of the door as he attempted to shut it. To any reasonable observer lacking the benefit of 20/20 hindsight, Ornelas's struggle with the Trooper by kicking the door appeared as active resistance to the Trooper's attempt to shut the door and regain control. Failure to give the instruction before taking action to close the door does not render Trooper Lovewell's actions unreasonable.[62]

Looking at the circumstances as a whole, then, all three factors support some use of force. Further, under the facts here, the amount of force employed here—kicking Ornelas's leg, forcing him back into the car—was not constitutionally excessive. Ornelas contends that

---

[61]*See, e.g., Marquez v. City of Albuquerque*, 399 F.3d 1216, 1221 (10th Cir. 2005); *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004); *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).

[62]At the minimum, Ornelas's conduct was a refusal to comply with Trooper Lovewell's directive that Ornelas remain in the patrol car when he placed him under arrest.

Trooper Lovewell had been trained that physical control methods that are known to have the probability of injury, including a kick to the kneecap, are to be used only when a suspect's resistance is at a dangerous level.  Moreover, he argues, Lovewell was trained that there are limited circumstances justifying the use of force: to effect an arrest, to prevent an escape, to protect a citizen, and in self-defense.  Ornelas contends that the only possible reason that applies here is self-defense, which Lovewell knew from his training required a suspect to have the capability and opportunity to inflict harm, and to be taking overt action to harm the officer.  In this case, Ornelas argues he was only passively resisting by not complying with the command to get his foot back in the vehicle or pushing the door away to avoid further injury and pain.  Given that he was seat-belted into the passenger seat with his hands cuffed behind his back, all Lovewell had to do was to step back away from the vehicle.   The law is clear, however, that police are not required to use the least intrusive means necessary, nor do violations of state law and police procedure generally give rise to a § 1983 claim for excessive force.[63]  This is because even if Lovewell used more than the minimum amount of force necessary and violated police procedure, he nonetheless could have acted reasonably.[64]  Here, Trooper Lovewell had seconds to react to what he perceived as a rapidly escalating situation and threat involving an upset and intoxicated defendant.  While courts have found the gratuitous use of force on an arrestee who has already been subdued to be unreasonable, there was no continued use of force after Ornelas

[63]*Marquez*, 399 F.3d at 1216; *Medina*, 252 F.3d at 1133; *Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake, State of Colo.*, 60 F.3d 702, 705 (10th Cir. 1995).

[64]*Marquez*, 399 F.3d at 1222.

complied and put his foot back inside the patrol car.[65]

Further, although Ornelas argues that Trooper Lovewell acted out of anger when Ornelas honked the patrol car horn and shouted profanities at the Trooper, the Court's analysis must not be informed by the officer's subjective intent or motives in deploying the force. Instead, Ornelas must establish that the Trooper's use of force was objectively unreasonable under the totality of the circumstances confronting him, without regard to underlying intent or motive.[66] Even if in hindsight the facts show that Ornelas was not a threat, the Court concludes that a reasonable officer could have perceived Ornelas's pushing on the car door in reaction to having it slammed on his leg as resistance. Because Ornelas has failed to carry his burden, Trooper Lovewell is entitled to qualified immunity as a matter of law.

**B.      Clearly Established Right**

Even if the Court were to find Trooper Lovewell's conduct violated a constitutional right, however, the Court is inclined to find that the Trooper's conduct did not violate clearly established constitutional principles. To demonstrate the infringement of a clearly established right, a plaintiff must direct the court "to cases from the Supreme Court, the Tenth Circuit, or the

---

[65]*See, e.g.*, *Gouskos v Griffith*, 122 F. App'x 965, 975–77 (10th Cir. 2005) (finding unreasonable force where officer threw to the ground a man who was picking up his daughter from a rowdy party, then choked the man almost to unconsciousness and continued to step on his back so he could not breathe after he was handcuffed and totally subdued); *Eberle v. City of Newton*, 289 F. Supp. 2d 1269, 1278 (10th Cir. 2003) (denying summary judgment on qualified immunity where intoxicated female plaintiff was kicked after being shoved to the floor in an interrogation room at police station); *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991) (officers stopped a man suspected of having information about a fight and beat him with a flashlight, despite his compliance); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (unreasonable for officers to forcefully slam plaintiff's face into a vehicle while she was restrained and subdued); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (unreasonable for officers to use pepper spray on suspect who was handcuffed on the ground but continued to squirm and kick his feet in the air);

[66]*Graham*, 490 U.S. at 397.

weight of authority from other circuits."[67]  This is not to say that an official action is protected by

qualified immunity unless the very action in question has previously been held unlawful, but it is

to say that in light of pre-existing law, the unlawfulness must be apparent.[68]  As the Tenth Circuit

has explained, a qualified immunity analysis involves something of a "sliding scale": "[t]he more

obviously egregious the conduct in light of prevailing constitutional principles, the less

specificity is required from prior case law to clearly establish the violation."[69]  In every case,

however, it remains necessary for the plaintiff to demonstrate that "every reasonable official

would have understood that what he" did violated the law.[70]  The question of whether a right is

clearly established must be answered "in light of the specific context of the case, not as a broad

general proposition."[71]  Thus, to overcome Trooper Lovewell's defense of qualified immunity,

Ornelas must demonstrate that it was clearly established, as of April 28, 2010, that Trooper

Lovewell's use of force under the facts of this case was excessive.  Ornelas has not carried this

burden.

    Trooper Lovewell's use of force was not such an egregious or obvious violation of

Ornelas's Fourth Amendment rights that Ornelas should not be required to point to a factually

---

[67]*Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008); *Thomas v. Durasanti*, 607 F.3d 655, 669 (10th Cir. 2010) (holding the plaintiff bears the burden of citing what he thinks constitutes the clearly established law applicable to his claim).

[68]*Weigel v. Broad*, 544 F.3d 1143 (10th Cir.2008) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)) (holding troopers violated clearly established law, as would preclude qualified immunity, where they employed unnecessary deadly force to restrain a suspect who was already handcuffed, whose legs were restrained, and who was lying prone, face down, and incapacitated).

[69]*Wilson v. City of Lafayette*, No. 11-1403, 2013 WL 518558, *2 (10th Cir. Feb. 13, 2013) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

[70]*Id.* (quoting *Ashcroft v. al-Kidd*, —U.S.—, 131 S. Ct. 2074, 2080 (2011)).

[71]*Saucier v. Katz*, 533 U.S. 194, 201 (2001).

analogous precedent in opposition to Lovewell's assertion of qualified immunity. Ornelas argues that there is ample case law, under similar circumstances, to support his argument that Lovewell violated clearly established law, and that given the state of the case law and the training Lovewell received, there can be no doubt that he should have known not to kick a substantially restrained and subdued arrestee. The cases cited by Ornelas are of limited usefulness, however, because the facts are dissimilar to this case, involving the use of a different and higher degree of force that was prolonged or continued after the plaintiff had been subdued or stopped resisting.

Ornelas cites to *Corder v. Denver*,[72] where the court affirmed the denial of a summary judgment motion based on qualified immunity on an excessive force claim involving an intoxicated plaintiff.[73] The police arrested a large, beligerent, intoxicated man who had been thrown out of a bar.[74] They then attempted to take the arrestee to jail in a transport van, but pulled over when he began rocking the van violently from side to side.[75] The police removed him from the vehicle and held him down over an extremely hot manhole cover while they attempted to place leg shackles on him.[76] The man did not resist when he was first asked to exit the van, and voluntarily complied with the officer's instructions to lay over the manhole cover.[77]

---

[72]No. 98-1453, 2000 WL 1234846 (10th Cir. Aug. 31, 2000) (unpublished).

[73]*Id*. at *4.

[74]*Id*. at *1.

[75]*Id*.

[76]*Id*. at *1–2.

[77]*Id*. at *1.

While he was being held down, he began kicking, screaming, and yelling that he was "on fire."[78] After forcibly holding him there for several minutes, one of the officers eventually maced the man in the face.[79] The arrestee suffered severe burns and sued the officers under § 1983.[80] The district court denied the officers' motion for summary judgment based on qualified immunity, and the Tenth Circuit affirmed.[81] Thus, while addressing the post-arrest use of force on an intoxicated plaintiff, the amount of force used by the officers in *Corder* is much greater than in this case, involving an arrestee who was held face down on the ground over a prolonged period of time, ending with a spray of mace to the face. Moreover, a single unpublished case does not necessarily indicate the law was clearly established.

Ornelas also relies on *Casey v. City of Federal Heights*.[82] In that case, Casey sued under § 1983, alleging that his Fourth Amendment protection against excessive force was violated when two police officers grabbed, tackled, and tasered him multiple times after he left a courthouse with a file that was not supposed to leave the building.[83] The plaintiff attempted to walk away from the officers but otherwise did not resist.[84] Employing the *Graham* factors and viewing the facts in the light most favorable to the plaintiff, the court determined that Casey had committed at most a misdemeanor in a harmless manner, that the officers had no reason to

---

[78] *Id*. at *2.

[79] *Id*.

[80] *Id*.

[81] *Id*. at *2, *4.

[82] 609 F.3d 1278 (10th Cir. 2007).

[83] *Id*. at 1280.

[84] *Id*.

believe he constituted a threat to anyone's safety, and that he was not actively resisting arrest or attempting to evade arrest by flight.[85]  The court concluded that a "reasonable jury could find [the officer's] use of force to be excessive and therefore unconstitutional.[86]  Unlike Ornelas, the plaintiff in *Casey* was not intoxicated, and the officers had no reason to believe he was resisting.

In *White v. Martin*,[87] the court addressed the attempted arrest of a paramedic who had been tending to a patient in an ambulance that was pulled over by a state trooper for allegedly failing to yield quickly enough to the trooper's vehicle.  The court held that the detainee's right against excessive force was clearly established when the attempted arrest was initially based on probable cause regarding the detainee's misdemeanor conduct in his efforts to avoid delay in taking a patient to the hospital, the detainee's conduct did not threaten the safety of others, and a videotape allowed an inference in favor of the detainee that he was not resisting arrest or attempting to flee when he was choked by the trooper, but was seeking assistance from another trooper.[88]  The detainee in this case was not intoxicated, however, and the court noted that the trooper continued to choke the detainee for ten to twelve seconds even after he stopped resisting.[89]  Even if analagous, however, the holding in *White* was issued more than a year after the incident giving rise to this litigation.

---

[85]*Id*. 1283.

[86]*Id*.

[87]425 F. App'x 736 (10th Cir. 2011).

[88]*Id*. at 743.

[89]*Id*.

In *Weigel v. Broad*,[90] the Tenth Circuit evaluated whether an officer using a maneuver that restricted a potentially intoxicated individual's airflow constituted excessive force. The individual was approached by an officer after he wrecked his car.[91] While in the process of conducting a field sobriety test, the individual tried to cross a busy highway, and was struck by a passing van's side view mirror.[92] An ambulance was called, but the suspect's behavior was strange and erratic, and he continued to try to cross the highway.[93] Concerned for the individual's safety, an officer tackled him and wrestled him to the ground in a ditch alongside the highway.[94] There were conflicting reports of the struggle, but it was "generally agreed that [the individual] fought vigorously, attempting repeatedly to take the troopers' weapons and evade the handcuffing."[95] In the midst of the "melee," the officer put the individual in a choke hold, but he continued to resist and fight.[96] A second officer was able to put handcuffs on the individual while the individual was in a choke hold.[97] The individual continued to struggle while handcuffed and a bystander laid on the individual's legs to restrict the individual's movement.[98] The officers maintained the individual in a face down position, with the bystander sitting on the

---

[90]544 F.3d 1143 (10th Cir. 2008).

[91]*Id*. at 1147.

[92]*Id*. at 1148.

[93]*Id*.

[94]*Id*.

[95]*Id*.

[96]*Id*.

[97]*Id*.

[98]*Id*.

individual's legs, one of the officers positioned on the individual's thighs and buttocks holding the individual's arms in place, and another officer sitting on the individual's torso.[99]  After the individual's legs were bound and hands cuffed, the officer sitting on the individual's thighs and buttocks got up, while the other officer and the bystander sat on the individual for approximately three minutes.[100]  The individual went into cardiac arrest and died as a result of "mechanical asphyxiation caused by an inhibition of respiration by weight applied to the upper back."[101]

The Tenth Circuit reversed the district court's grant of summary judgment on qualified immunity grounds, because "there is evidence that for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death."[102]  Key to the Tenth Circuit's ruling was the fact that the troopers had been specifically trained on Tenth Circuit case law leading to the prohibition of hog-tying detainees and on the dangers of asphyxia by placing pressure to a suspect's upper back once he is handcuffed and restrained while in a face-down prone position.[103]  In this case, Ornelas does not point to any such specific training other than general principles justifying the use of force.  Another important fact distinguishing *Weigel* from this case is the court's finding that, although the events happened quickly and the officers were, up to a point, protecting themselves, the public and Weigel, it was "not addressing split second decisions by law enforcement officers to protect themselves and the public," after it

[99]*Id.*

[100]*Id.* at 1152.

[101]*Id.* at 1149.

[102]*Id.* at 1153-55.

[103]*Id.* (citing *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001)).

was readily apparent that Weigel had been fully restrained and posed no danger.[104]

And finally, Ornelas cites *Smith v. Delamaid*, where the court observed, "[a] reasonable police officer would know that to kick, punch, and throw a restrained, cooperative arrestee constitutes excessive force under the Due Process standard."[105] While the quote is accurate, Ornelas does not describe the facts of the case. After the plaintiff was arrested for DUI, he was verbally abusive to the police officers and broke a breathalyzer machine. After he was restrained by handcuffs and/or ankle shackles, plaintiff alleged that he was hit in the ear, punched in the kidneys, kicked in the groin, and thrown against the wall and the floor; while he was on the ground, one of the officer stepped on his throat.[106]

Thus, the cases cited by Ornelas fall short of demonstrating "the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains."[107] Moreover, the record does not establish Trooper Lovewell's conduct was so obviously egregious as to diminish the specificity needed from prior case law to clearly establish the violation.[108] Although in hindsight, the force Trooper Lovewell used might have been excessive relative to the threat it turned out he faced, Ornelas is required to show that the force the Trooper used under the rapidly evolving circumstances was *clearly* excessive. And this Ornelas fails to do—he identifies no authority or general legal principle suggesting the kick to the leg in this

---

[104]*Id.*

[105]842 F. Supp. 453, 459 (D. Kan. 1994). The Court notes the Due Process standard is more onerous than the Fourth Amendment reasonableness standard.

[106]*Id.* at 460.

[107]*Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).

[108]*Becker v. Bateman*, 709 F.3d 1019, 1022–25 (10th Cir. 2013) (citing *Morris*, 672 F.3d at 1196).

case was clearly excessive in light of Trooper Lovewell's legitimate self-defense interest.

Nor does Ornelas's argument regarding Trooper Lovewell's training in the use of excessive force have merit. Training on general principles regarding use of force does not rise to the level of training on prohibition on a specific type of force used because the Supreme Court has deemed that type of force unconstitutional. And, as discussed throughout this opinion, police are not required to use the least intrusive means necessary, nor do violations of state law and police procedure generally give rise to a § 1983 claim for excessive force.[109] There is no question that Ornelas suffered a serious injury when Trooper Lovewell used force during the incident before the Court. But the Supreme Court has directed district courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except "the plainly incompetent or those who knowingly violated the law,"[110] in order that officers might not be duly "inhibit[ed] . . . in performing their official duties."[111] Given the direction the Court has from the Supreme Court and Tenth Circuit precedent, and in light of the state of the law as of 2010, the Court cannot say that it was clearly established that Trooper Lovewell's use of force under this specific factual situation was unlawful. Acccordingly, Trooper Lovewell is also entitled to qualified immunity on the second prong.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Exclude Expert Testimony (Doc. 45) is GRANTED in part, and DENIED in part;

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc.

---

[109]*Marquez*, 399 F.3d at 1216; *Medina*, 252 F.3d at 1133; *Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake, State of Colo.*, 60 F.3d 702, 705 (10th Cir. 1995).

[110]*Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[111]*Medina*, 252 F.3d at 1127.

43) on the issue of qualified immunity is GRANTED.

**IT IS SO ORDERED.**

Dated: <u>June 26, 2013</u>

<u> S/ Julie A. Robinson </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE